THE PEOPLE *ex rel.* Charles W. Espey, Petitioner, *vs.*
CHARLES S. DENEEN *et al.* Respondents.—THE PEOPLE
*ex rel.* Joseph A. McInerny, Petitioner, *vs.* CHARLES
S. DENEEN *et al.* Respondents.

*Opinion filed December 21, 1910.*

1. ELECTIONS—*section 11 of "legislative" Primary act of 1910
gives senatorial committee power to fix number of candidates.* The
provision of section 11 of the Primary act of 1910, relating to
nominations for the General Assembly, (Laws of 1909-10, p. 77,)
that the senatorial committee of each party shall by resolution "fix
and determine" the number of candidates to be nominated by their
party for representatives, is not a mere declaration of party policy
but gives the committee power to fix the number of candidates.

2. SAME—*number of candidates fixed by senatorial committee
is final.* Under section 11 of the Primary act of 1910, relating to
nominations for the General Assembly, any number of candidates
may procure their names to be put upon the primary ballot as can-
didates for representative and the voter may vote for three candi-
dates or cumulate his vote upon two or one, but if the senatorial
committee has determined, by resolution, that less than three can-
didates shall be nominated, the candidates standing the highest in
votes, up to the number fixed by the committee, are the only ones
whose names can go on the official ballot as nominees for represen-
tative, even though a greater number were voted for at the primary.

3. SAME—*sections 7 and 8 of article 4 of constitution, relating
to minority representation, apply to primary elections.* Sections 7
and 8 of article 4 of the constitution, giving the right to the voter,
in elections for representatives in the General Assembly, to cast
as many votes for one candidate as there are representatives to
be elected, or to distribute his votes, or equal parts thereof, among
the candidates, as he sees fit, apply to primary elections for the
nomination of candidates for representatives in the General As-
sembly. (*Rouse* v. *Thompson,* 228 Ill. 522, and *People* v. *Strass-
heim,* 240 id. 279, followed.)

Special concurrence by HAND, J.
Separate opinion by CARTWRIGHT, CARTER and DUNN, JJ.

ORIGINAL petition for *mandamus.*

DAVID K. TONE, and HENRY M. ASHTON, for petition-
ers.

247—19

W. H. STEAD, Attorney General, and CHARLES E. WOODWARD, (GEORGE H. WILSON, of counsel,) for respondents.

Ross C. HALL, for John J. McLaughlin.

Mr. JUSTICE FARMER delivered the following opinion:

At our October term leave was granted, at the relation of Charles W. Espey, to file an original petition in this court for a writ of *mandamus* against the Governor, Secretary of State and State Treasurer, composing the State primary canvassing board, directing said board to certify the name of relator as one of the democratic nominees to the Secretary of State, to be placed upon the official ballot as a candidate at the election to be held November 8, 1910, for representative in the General Assembly for the first senatorial district. The petition alleges that the relator complied with the requirements of the Primary Election law for the nomination of candidates for the General Assembly, and that his name was duly and lawfully placed on the primary ballot as one of three democratic candidates in the first senatorial district for nomination for representative in the General Assembly to be voted for at the primary election held on the 15th day of September, 1910; that John Griffin and Lawrence Byrne were the other two candidates on the same ticket with relator for nomination by the democratic party for the office of representative in the General Assembly for the first senatorial district. The petition alleges that Griffin received 6078 votes, Byrne 1567 and relator 545; that, the relator being one of the three highest candidates in votes, it became the duty of the State primary canvassing board to certify his name as one of the democratic candidates to be placed on the official ballot to be voted for at the election November 8, 1910. The petition alleges that on the 5th day of October, 1910, at a meeting

of the State primary canvassing board duly called and held in the city of Springfield, said board issued a proclamation declaring that John Griffin was the only democratic nominee for representative in the General Assembly for the first senatorial district, and that it was the intention of said board, after the expiration of ten days, to file their certificate in writing with the Secretary of State certifying said John Griffin as the only democratic nominee for representative for the first senatorial district. The petition alleges that said board refused to certify the relator's name as one of the democratic nominees for the reason that on August 1, 1910, a resolution was adopted by the democratic senatorial committee for the first senatorial district determining that only one candidate for representative in the General Assembly in that district should be nominated by the democratic party at the primary election. A similar petition, except in one unimportant particular not necessary to be referred to, was also filed by leave of the court at the October term at the relation of Joseph A. McInerny. The Attorney General entered the appearance of the defendants and demurred to each of said petitions. Printed briefs and arguments were filed, and as the canvassing board was required to file its certificate of the nominations made within ten days after the completion of the canvass, the cause was set down for oral argument at the October term and was argued orally by counsel on both sides. The cases were considered at once by the court and the conclusion reached that the writs should be denied. The decision was announced orally by the chief justice during the October term, with the statement that the reasons for the denial of the writ would be stated in an opinion to be subsequently filed. As the decision of one case is conclusive of the other, but one opinion will be filed.

The cases involve the validity of an act entitled "An act to provide for the holding of primary elections by political parties for the nomination of members of the General

Assembly and the election of senatorial committeemen."
(Laws of 1909-10, p. 77.) The act was approved March
9, 1910, and went into effect July 1, 1910. It is a separate
act for the nomination of candidates for the General As-
sembly by a primary election. Another act for the nomi-
nation of other officers by primary election was passed,
approved and went into effect at the same time.

Section 1 of the act under consideration provides that
"the nomination of all candidates for members of the Gen-
eral Assembly by all political parties, and the election of
senatorial committeemen, as defined in section 2 of this act,
shall be made in the manner provided in this act and not
otherwise." Said section further provides that the name
of no person should be placed upon the official ballot to be
voted for at the election in November, 1910, unless such
person had been nominated under the provisions of the act.
By section 4, September 15, 1910, was fixed as the date
for holding the first primary election after the adoption of
the act, and after that time the second Tuesday in April
was fixed as the date for holding such primary elections.
Section 5 provides that there shall be a senatorial commit-
tee for each senatorial district and provides for the election
of said committee at the primary election. Subsequent sec-
tions prescribe the requirements to be complied with by a
candidate in order to get his name placed upon the official
primary ballot to be voted at the primary election. Sec-
tion 10 requires the Secretary of State to certify to the
county clerk the names of the candidates for senatorial of-
fices entitled to be printed on the primary ballot and the
position such names shall occupy on such ballot. Said sec-
tion also requires the Secretary of State to certify to the
county clerk the names of the candidates for senatorial
committeemen, and their names shall also be printed on the
official primary ballot. The provision of the said Primary
Election law upon the construction of which the decision

of these cases depends is section 11. Said section reads as follows:

"Sec. 11. At least thirty-three (33) days prior to the date of the April primary the senatorial committee of each political party shall meet and by resolution fix and determine the number of candidates to be nominated by their party at the primary for representative in the General Assembly. A copy of said resolution, duly certified by the chairman and attested by the secretary of the committee, shall, within five days thereafter, be filed in the office of the Secretary of State, and in the office of the county clerk of each county in the senatorial district. In all primaries for the nomination of candidates for representatives in the General Assembly each qualified primary elector may cast three votes for one candidate, or may distribute the same or equal parts thereof among two candidates or three candidates, as he shall see fit. And the said candidate or candidates for nomination highest in votes shall be declared nominated for the office to be filled."

Counsel for relators contend that this court having heretofore decided, in passing upon the validity of primary election acts, that a primary election law requiring all nominations of candidates for representative in the General Assembly to be made at a primary election is governed by sections 7 and 8 of article 4 of the constitution, each legal voter has the right to vote for three candidates at such primary election or to cumulate his vote upon one or two candidates, and that this right of the voter cannot be abridged or restricted by the legislature. It is also contended that the provision of section 11 authorizing a senatorial committee of a political party to fix and determine the number of candidates for representative to be nominated by that party at a primary election was not intended to authorize the committee to limit the number of candidates the party should nominate, or to prohibit the nomination of three candidates if the electors of the district voted for the nomination of

that number of candidates. It is argued that the authority of the senatorial committee to fix and determine the number of candidates to be nominated is a mere declaration of party policy, which the voters are at liberty to follow or disregard, as they see fit. If this construction is the proper one to be given to said provision of section 11, it would result in the nomination of three candidates by each political party in every district where three candidates were voted for, and the canvassing board would be required to certify the names of the three candidates of each political party receiving the highest number of votes, as nominees of said party for the office of representative. It is insisted that was the legislative intent, and that by giving section 11 that construction the law would be subject to no constitutional objections and would be a valid law, whereas if it were construed to mean that the legislature intended conferring power upon a senatorial committee of a political party to fix the number of candidates that party should nominate, said section 11 would be unconstitutional and void. The position taken by the Attorney General is, that section 11 will admit of no other construction than that the legislature intended to confer power upon the senatorial committee to fix and determine the number of candidates to be nominated by a political party, but he contends that sections 7 and 8 of article 4 of the constitution do not apply to nominations of candidates for representative in the General Assembly, and the delegation of power, therefore, to the senatorial committee to determine the number of candidates to be nominated is not invalid. The Attorney General further contends that if this construction is incorrect the result would be that the names of three nominees for each political party would have to be placed upon the official election ballot in each district where three candidates were voted for for the nomination by the voters, and that this would nullify the constitutional provision for minority representation. It will thus be seen that each party insists that the construction

contended for by the other would render section 11 uncon-
stitutional and void.

In our opinion the provision of section 11 authorizing
the senatorial committee to fix and determine the number
of candidates to be nominated by a political party is not
susceptible of the construction contended for by relators.
It seems plain from the language used that it was unques-
tionably the intention of the legislature to give the sena-
torial committee authority to fix the number of candidates
that should be nominated.    It was decided in *Rouse* v.
*Thompson,* 228 Ill. 522, and *People* v. *Strassheim,* 240
id. 279, that the constitutional provisions with reference to
cumulative voting at the election for representative in the
General Assembly applied also to a primary election for the
nomination of candidates for representative, and that the
voter at a primary election could not be deprived of the
right to vote for one, two or three candidates or to cumu-
late his vote upon one or two candidates.    The act under
consideration in the *Rouse case* authorized the voter to vote
for only one candidate at the primary election for nomi-
nation for representative in the General Assembly, and if
more than one candidate for that office was to be nominated
by the political party the additional candidate or candidates
were required to be nominated by a senatorial convention,
and in making such additional nominations the senatorial
convention acted without reference to the vote at the pri-
mary election.    The court held that this denied the voter his
constitutional right to vote for one, two or three candidates
or to cumulate his vote, and was therefore invalid.    The
provisions of section 11 of the Primary Election law con-
sidered by this court in the *Strassheim case,* relating to the
powers of the senatorial committee to fix and determine the
number of candidates to be nominated, were identical with
the provisions of section 11 of the act now under consid-
eration, but the act before the court in the *Strassheim case*
did not restrict the right of the elector to vote for but one

candidate for nomination, but authorized him to cast one vote for each of as many candidates as the senatorial committee had decided should be nominated. This, it was held, following the *Rouse case,* violated the constitutional right of the elector to vote for three candidates or to cumulate his vote, and rendered the section invalid. That section and others of the act being unconstitutional, it was held rendered the whole act invalid, and it was not necessary to construe or pass upon the validity of the provision relating to the power of the senatorial committee.

The only difference between section 11 of the act considered in the *Strassheim case* and the present act is, that the present act authorizes the elector to cast three votes for one candidate or to distribute the same, or equal parts thereof, among two or three candidates, if he sees fit so to do, "and the said candidate or candidates for nomination highest in votes shall be declared nominated for the office to be filled." The voter is not restricted in the number of candidates he may vote for or in his right to cumulate his vote, but the plain meaning of the section is, that the number of candidates to be nominated is to be limited to the number fixed and determined by the senatorial committee. Any number of candidates may procure their names to be placed on the primary election ballot, and each elector may vote for three or cumulate his vote on one or two candidates, but if the senatorial committee has determined that only one candidate shall be nominated, the candidate receiving the highest number of votes at the primary election is to be the nominee, and his name, only, is to go upon the official ballot to be voted for for said office at the election. If the committee of each political party determines to nominate more than one candidate, the candidates highest in votes, to the number fixed and determined by the committee, shall be the nominees of the political party. There is not the slightest warrant in the language used to justify the construction that the legislature intended the resolution

of the senatorial committee should mean nothing more than that the committee had decided it would be the best party policy to nominate the number of candidates fixed in the resolution, but that this was to be in no sense binding upon the electors and might be disregarded by them. Section 11 says, in explicit language, that the senatorial committee of each party shall meet at least thirty-three days prior to the date of the primary election, "and by resolution fix and determine the number of candidates to be nominated by either party at the primary for representative in the General Assembly." There is no more reason for holding that the legislature did not mean what it said but meant something else, than there would be for saying that the legislature did not mean what it said when it said in section 1 that all candidates for members of the General Assembly should be nominated at a primary election but meant that they should be nominated at a delegate convention. It never was the intention of the legislature to pass a law the effect of which would be to require in any district that each political party should nominate three candidates. This could only be avoided by giving the senatorial committee power to fix or limit the number of candidates to be nominated, and this the legislature intended to do by section 11. If, then, sections 7 and 8 of article 4 of the constitution apply to primary elections for the nomination of candidates for representative in the General Assembly, section 11 must be held invalid.

We had supposed this question settled by previous decisions, but it is contended by counsel for respondents that it has not been so settled. The validity of the Primary Election law of 1905 was considered by this court in *People* v. *Election Comrs.* 221 Ill. 9, and it was there said (p. 18) : "The right to choose candidates for public offices whose names will be placed on the official ballot is as valuable as the right to vote for them after they are chosen and is of precisely the same nature. There is scarcely a possi-

bility that any person will or can be elected to office under this system unless he shall be chosen at a primary election, and this statute, which provides the methods by which that shall be done and prescribes and limits the rights of voters and of parties, must be regarded as an integral part of the process of choosing public officers, and as an election law. * * * The legitimate purpose of such a law, however, must be to sustain and enforce the provisions of the constitution and the rights of voters, and not to curtail or subvert them or injuriously restrict such rights." In *Rouse v. Thompson, supra,* it was held that a primary election is an election within the purview of the constitution and is controlled by the provisions of the constitution; that the constitutional provisions apply to primary elections with the same force as they do to general elections. It was said the right to nominate candidates for representative is of precisely the same nature as the right to vote for them after they are nominated, and a primary election law for such nominations is governed by the constitution and cannot deprive the voter of any right given him by the constitution. In *People v. Strassheim, supra,* we considered the validity of a provision of the act of 1908 which authorized the elector to vote at a primary election one vote each for as many candidates as the senatorial committee had determined should be nominated, and, following the previous decisions, we held said provision was an attempted abridgment or restriction of the elector's constitutional right to vote for three candidates or cumulate his vote upon a less number, if he so desired.

We know of no valid distinction or reasonable basis upon which we would be justified in holding that a primary election law is an election law within the meaning of the constitution, and that the rights of electors cannot be abridged or restricted by a primary election law for the nomination of candidates to any office except that of representative in the General Assembly, but as to that office

the constitutional right guaranteed by sections 7 and 8 of article 4 does not apply. We are therefore forced to the conclusion that the provision of section 11 referred to is invalid, on the ground that it is an attempt by the legislature to confer upon a senatorial committee power to fix and determine the number of candidates for representative that shall be nominated by a political party in a senatorial district.

We are also of opinion that if section 11 were construed to mean that the senatorial committee is not given the power to fix and determine the number of candidates that shall be nominated but that the resolution adopted by it is a mere declaration of party policy, and that, notwithstanding the decision of the committee in fixing and determining that a less number than three candidates should be nominated, the electors were at liberty to nominate a greater number of candidates than had been determined by the committee, and that in all districts where three candidates were voted for by the qualified electors of each political party the names of three candidates were required to be placed upon the official ballot to be voted for at the election, it would render the act unconstitutional and void, in that it would nullify the constitutional guaranty of minority representation in the General Assembly. This is conceded to be so by the Attorney General. This question was referred to in the *Strassheim case,* where we said: "If each political party were required to nominate three candidates it would render nugatory the constitutional provision for minority representation, for if each party nominated three candidates it would frequently, if not generally, happen that the dominant party in a senatorial district would elect three candidates and the minority party would be without representation." Counsel for relators say this language w
mere *obiter,* as that question was not of controlling
portance in the decision of the case. Howev
be, it was the deliberate expression of the

entertained of the validity of any law under the operation
of which each political party might be required to nomi-
nate three candidates for representative in the General As-
sembly, and, whether necessary to a decision of the case
or not, it was considered important, as an expression of
the court's view, for the benefit of the legislature, if that
body should afterwards deal with the subject of nomination
of candidates for representative in the General Assembly
by the adoption of another primary election law.

In the report of the committee on electoral and repre-
sentative reform of the constitutional convention of 1870,
signed by Joseph Medill, chairman, (1 Debates of the
Const. Convention, p. 561,) will be found an exhaustive
discussion of the subject of minority representation in the
General Assembly. It was stated in said report: "Since
1854 one of the political parties has secured, with few ex-
ceptions, all the senators and representatives at every elec-
tion in the north half of Illinois, and the other party, with
equally few exceptions, has elected all the legislators from
the south half of the State. Speaking in round numbers,
100,000 republicans living south of the State capital have
been practically disfranchised in the legislature for sixteen
years, and almost as many democrats have been excluded
from all voice in making laws through agents of their own
selection for an equally long period of time. For half a
generation the State has been thus represented by sections
instead of districts. If the alternate districts were demo-
cratic or republican there would be some amelioration of
the evil. But such is not the case, and so long as the ex-
isting system of exclusive majority representation is con-
tinued there is little hope for improvement."

The proceedings of the convention show that petitions
and memorials were presented to it at different times ask-
ing the adoption of a constitutional provision for minority
representation. When the convention took up considera-
tion of the report of the committee on electoral and repre-

sentative reform Mr. Medill offered a substitute for the provisions embraced in the report relating to minority representation. The substitute·was adopted and became sections 7 and 8 of article 4 of the constitution. Mr. Medill addressed the convention at considerable length, as did also other members of the convention, advocating the adoption of the proposed provision and giving their reasons for supporting the plan of minority representation. (2 Debates of the Const. Convention, p. 1726.) In his address Mr. Medill said, in part: "There are thousands of young men and advanced minds in this State who think more highly of this proposition than of anything else we will have to offer them. Everything else will seem to them dry and unimportant in comparison with this great idea of equal representation of the whole people against exclusive representation of a part. The disfranchised and down-trodden minorities will everywhere rally to its support and secure to the new constitution, for its sake, a triumphant ratification. This great measure of reform will carry out pure democratic equality and equal rights for all men in the legislative halls; secure the equal representation of every citizen, the minority with the majority, man for man; allay partisan strife, reform legislative corruption, purify the elective system, inspire good and quiet citizens to attend the polls, enable virtuous citizens to elect pure and able representatives and to defeat bad aspirants. It will give contentment to all classes of voters, secure representation for our long-enduring republican friends in democratic Egypt, and give the swallowed-up and buried-under democrats of northern Illinois a chance, also, of being heard in our legislative halls by men of their own selection. This plan will work no harm or prejudice to either of the great parties, but will put in the legislature democrats from northern Illinois, republicans, in equal numbers, from southern Illinois, and secure to both parties representation from all parts of the State. Is not this right, just, politic and advisable?"

Whatever may be thought of the wisdom of the plan of minority representation, its adoption was highly creditable to the convention, for in adopting it the members of the convention acted entirely independently of partisan feeling and bias, and were controlled only by the desire that the people of the State should, as far as possible, be represented in the legislature, in some measure, by members of their own choice. But it is immaterial whether or not we agree with the convention as to the wisdom of minority representation. It became a part of the organic law of the State, and so long as it remains a part of that law the legislature cannot by any act repeal or nullify the constitutional provision.

This State and many others have constitutional provisions authorizing cumulative voting by stockholders in the election of directors or managers of corporations, and these provisions were designed to enable minority stockholders to have representation in the boards of directors or managers of corporations. In California, where cumulative voting by stockholders of a corporation is authorized, it was attempted to defeat this right by providing by by-laws that but one director of a corporation should be elected at a time. The legality of this by-law came before the Supreme Court of that State in *Wright* v. *Central California Water Co.* 67 Cal. 532. The court said: "We think the power thus conferred upon a corporate elector can only be exercised, according to the constitutional provision, by allowing him to cast his ballot singly, cumulatively or distributively, at one time, for the election of directors, for if but one director at a time be balloted for, a majority of the stockholders could, by combining, cumulate their votes each time upon a single candidate and elect him, and by thus shaping and controlling the manner of election it would be in the power of the majority of the stockholders to virtually cancel the votes of the minority and deprive them of their rights to representation on the board of directors."

This is unquestionably sound, for there can be no cumulative voting where there is but one officer to elect. The guaranty of minority representation by the constitution is a prohibition against the legislature passing a law that expressly denies that constitutional right, or any law which, though not expressly denying the constitutional right, authorizes its defeat. What it is not competent for the legislature to do directly it cannot do indirectly, and any attempt to authorize or afford a plan for the defeat of a constitutional provision by legislative enactment is as void as an act which attempts in express terms to nullify the constitution. It is no answer to this position to say that requiring the nomination of three candidates by each political party where three are voted for at the primary election does not necessarily defeat minority representation, because, notwithstanding the nomination of three candidates by the minority party, the voters could elect one member of the house of representatives by cumulating their votes upon one of the nominees. Unless we know less as judges than we do as men, (and this court has decided that we do not,) we know that effective cumulative voting under such circumstances is practically an impossibility. The constitution guarantees the right of minority representation, and the legislature has no power to pass any law the direct purpose or practical operation of which defeats, abridges or restricts that right.

Counsel for relators argue that the public good would be best conserved by sustaining the validity of section 11 and construing it to require the nomination of three candidates by each political party in all districts where that number of candidates are voted for by the voters of said parties. If the law be so construed and sustained, it is said, it will have the beneficent effect of taking the control of primary elections and the nomination of candidates out of the hands of party bosses and managers. Counsel say in their brief: "The independent voter does not usually

take the trouble to attend party primaries but usually indicates his choice of nominees at the election. A comparison of the total vote cast at primary elections with the total vote cast at important general elections in the city of Chicago during the recent elections shows that less than twenty per cent of the persons who vote at the general elections cast their vote at the primary." From this it is argued that the party managers and bosses control the primary elections and select the senatorial committeemen. If this is true, it is not the fault of the law but the fault of the voters themselves. The law authorizes every qualified elector to cast his vote for the nomination of candidates of his choice at the primary election, and the vote of the humblest and most obscure citizen counts as much as that of the party boss or manager. If voters, as counsel say, will not "take the trouble" to attend primary elections and vote for the nomination of candidates after the legislature has afforded them the opportunity to do so, they are in no position to say that they are not satisfied with the nominations made according to law, and ought to have a larger number of candidates to select from on the day of the election than have been legally nominated by the voters who "took the trouble" to go to the polls on primary election day. And what assurance is there that if such opportunity is afforded them on election day they would "take the trouble" to avail themselves of it any more than they would to avail themselves of the right to assist in making the nominations on primary election day? Moreover, the independent voter is not prohibited from securing the nomination, by petition, of a candidate that will meet his approval. At all events, the beneficent results that it is thought would follow from the construction of the law contended for by the relators would not justify a court in sustaining the validity of such a law, if, as we think clearly is the case with the law under consideration, it is in violation of the constitution.

·Section 11 being unconstitutional it invalidates the entire act, and the demurrers are sustained and the writ in each case is denied.                    *Writs denied.*

Mr. JUSTICE HAND, specially concurring:

This case involves the construction and constitutionality of section 11 of "An act to provide for the holding of primary elections by political parties for the nomination of members of the General Assembly and the election of senatorial committeemen," approved March 9, 1910, (Laws of 1909-10, p. 77,) which section reads as follows:

"Sec. 11.  At least thirty-three (33) days prior to the date of the April primary the senatorial committee of each political party shall meet and by resolution, fix and determine the number of candidates to be nominated by their party at the primary for representative in the General Assembly.  A copy of said resolution, duly certified by the chairman and attested by the secretary of the committee, shall, within five days thereafter, be filed in the office of the Secretary of State, and in the office of the county clerk of each county in the senatorial district. ·

"In all primaries for the nomination of candidates for representatives in the General Assembly each qualified primary elector may cast three votes for one candidate, or may distribute the same or equal parts thereof among two candidates or three candidates, as he shall see fit.  And the said candidate or candidates for nomination highest in votes shall be declared nominated for the office to be filled."

The opinion written by Mr. Justice Farmer, and concurred in by Mr. Chief Justice Vickers and Mr. Justice Cooke, construes the first paragraph of this section of the statute to confer, in terms, absolute power upon the several senatorial committees of the several political parties of the fifty-one senatorial districts of the State to fix and determine, by resolution, the number of candidates to be nominated by their parties at the primary for representa-

tives in the General Assembly; while the view of the opinion of Justices Cartwright, Carter and Dunn is, that the power conferred upon the senatorial committees · by that paragraph is intended to be only suggestive, and that while the several senatorial committees of the several political parties of the State may, under said paragraph, fix and declare, by resolution, the number of candidates to be nominated for representatives in the General Assembly by their respective parties at the primary elections, such action of such committees is not binding upon the voters of such parties, and that such action does not prevent the members of the party, when voting, from voting for and nominating as many candidates, not to exceed three in number, for representatives in the General Assembly as any one voter may determine to vote for at the primary election. The difference thus far is only in the matter of the construction of said statute. I am of the opinion that said section 11 was passed with a view to confer the power upon the several senatorial committees of the several political parties in the State to absolutely fix and determine the number of candidates to be nominated by such political parties at the primary to be held for the nomination of representatives in the General Assembly. · The language used is clear and unequivocal in its terms. It is so plain that it is not open to construction, and means one thing and only one thing,— that is, that power is conferred upon the senatorial committees of the different political parties of the State to fix and determine the number of candidates which may be nominated. So far as the first paragraph of section 11 is concerned, the only question, therefore, which is open to debate is as to its constitutionality,—that is, as to the power of the legislature, under the constitution, to confer upon the several senatorial committees the power to fix for their respective parties the number of candidates for representatives in the General Assembly which should be nominated at the primary election.

Justices Farmer, Vickers and Cooke having reached the conclusion, in their opinion, that the senatorial committees cannot be given power to fix the number of candidates which shall be nominated by their respective parties at the primary election for representatives in the General Assembly, then hold that that question is open when the voter goes to the primary election and that the voter can then determine how he will vote,—whether for one, two or three candidates, and may cumulate his vote,—the result of which would be that in every senatorial district in the State three candidates would in all probability be nominated by each party for representative in the General Assembly, the effect of which would be to destroy the scheme of minority representation found in the constitution, and that said section 11 is unconstitutional and void. The logical result of this course of reasoning is, that no statute can be passed authorizing the nomination of candidates for representatives in the General Assembly which would be constitutional, and that candidates for representatives in the General Assembly cannot be nominated at a primary election.

The opinion of Justices Cartwright, Carter and Dunn holds that the voter is not bound by the resolution of the senatorial committee as to the number of candidates for representative in the General Assembly which shall be nominated by his party at the primary election, and that it was not intended by the General Assembly that he should be bound, and that a statute which seeks to foreclose him upon that question would be unconstitutional and void, and that the present statute, although its language is clear and unequivocal, should be construed so as to authorize only a suggestion by the senatorial committee to the members of their party as to the number of candidates for representative in the General Assembly for which they should vote, which suggestion the voters need not follow but may vote for as many candidates as they see fit, not exceeding three,

and if there are votes cast for three candidates at the primary election for representative in the General Assembly, as was the case here, the names of those three candidates must go upon the ballot at the general election for representatives of the General Assembly, and that although the result might be that each party would, by the action of one voter or a small number of voters in each of the political parties in each senatorial district, be forced to nominate three candidates for representative in the General Assembly, and would have three party candidates for representative in the General Assembly upon the general ticket at the fall election, such construction does not destroy minority representation, because the voter still would have the right to cumulate his vote at the general election, and, by concerted action with the other voters of his party, the majority party could elect two members of the General Assembly and the minority party could elect one member of the General Assembly from each senatorial district in the State.

This probably may be true in theory, but practically I am of the opinion if each party should, in the several senatorial districts of the State, be required to nominate three candidates for representative in the General Assembly, minority representation would be destroyed, and that any law which would require the placing of three candidates upon the ballot at the general election would for that reason be unconstitutional and void. I fully agree with the opinion of Justices Farmer, Vickers and Cooke upon that question, and I do not accede to the argument contained in the opinion of Justices Cartwright, Carter and Dunn that such a statute is rendered constitutional by reason of the fact that the voter and his party associates may possibly agree to cumulate their votes upon some party candidate at the polls. I think the argument that the statute is thus saved from being unconstitutional is fully met by what is said by this court in *People* v. *Election Comrs.* 221 Ill. 9, where it was announced that the right of the voter to write

in the name of a candidate upon the primary ballot did not relieve the act then under consideration of its unconstitutional features, as the right to write in the name of a candidate furnished to the voter no practical relief. In that case a candidate could not get his name upon the primary ballot without paying money for the privilege, and it was held that that feature of the act was void, although the voter had the right to write in the name of a candidate who had paid nothing to get his name upon the ticket. On page 22 of the opinion it was said: "That argument does not call for much attention. It is a foregone conclusion that the candidate will be chosen from those whose names are on the primary ballot, and it is no answer to the argument against an illegal and arbitrary discrimination in favor of one who is able and willing to make a cash contribution and against one who is unable or unwilling to do so, to say that the voters may write the name of a candidate on the ticket and make a square in front of it and put a cross in the square." It is well known to all that the voters of all parties usually vote their party ticket as it is printed, and the right of an agreeing body of voters to cumulate votes would not relieve the statute of its unconstitutional feature if every political party is required to nominate three candidates for representative in the General Assembly, whose names would appear under the party appellation upon the general ballot.

I now come to the question, is said section 11 constitutional as it was enacted by the legislature and now exists? The provision of the constitution which is involved reads as follows: "The house of representatives shall consist of three times the number of the members of the senate, and the term of office shall be two years. Three representatives shall be elected in each senatorial district at the general election in the year of our Lord 1872, and every two years thereafter. In all elections of representatives aforesaid, each qualified voter may cast as many votes for one

candidate as there are representatives to be elected, or may distribute the same, or equal parts thereof, among the candidates, as he shall see fit, and the candidates highest in votes shall be declared elected." (Hurd's Stat. 1909, p. 56.) If this provision of the constitution be analyzed it will be found, first, that the right of the voter to cast three votes for representatives in the General Assembly, and the right to cumulate his votes by distributing them among the three candidates as he sees fit, is secured to the voter; and secondly, that the right of minority representation involved in that method of voting is established.

I think many difficulties have arisen in construing this provision of the constitution by confusing the right of cumulative voting and the right of minority representation. The right to cumulate his vote on the question of the election of representatives in the General Assembly is a right secured to the individual voter while the right of minority representation is a right secured to political parties, and if those two rights are severed I think the questions involved in this case will be greatly simplified.

It has been determined by this court that the nomination of candidates for representatives in the General Assembly falls within the purview of legislation governing the holding of primary elections, and it is a well settled rule of statutory and constitutional construction that where two provisions of a statute or a constitution are inconsistent or in apparent conflict, it is the duty of the court, in construing such statute or constitutional provisions, to harmonize such provisions, and the courts will go a long way to do so, and thereby ascertain the view of the law-making power and sustain the law, rather than to annul the provisions of a statute or of a constitution by holding them inoperative. I think, therefore, that this court should so construe said provision of the constitution as to hold a primary election can be held for the nomination of candidates for representatives in the General Assembly, and to determine that

it may be held in such a way that no voter in the primary election or at the polls may be deprived of any of his constitutional rights, and so to construe said constitutional provision that minority representation will not be destroyed. Minority representation is based upon the idea that political parties will exist in this State. Since the constitution of 1870, and prior to the passage of primary election legislation in this State in recent years, the several political parties in the State have solved the question of minority representation without difficulty. The majority party in each senatorial district has usually nominated two candidates and the minority party one candidate for representatives in the General Assembly, and the Australian Ballot law recognizes the rights of parties so to do. I take it that the determination of the question, in any particular senatorial district, of the number of candidates a party will place in the field for representatives in the General Assembly is a mere matter of party policy, and that a political party, being a voluntary association, has a right to decide that question for itself,—and such is the doctrine of this court announced in *Rouse* v. *Thompson,* 228 Ill. 522. It was clearly announced in that case that the political parties of this State have the right, through their senatorial committees, to determine how many candidates they will put in the field for representatives in the General Assembly in the several senatorial districts for which such committees act, and that so long as each voter has the right to vote for the number of candidates determined by the senatorial committee of his party to be nominated, and to cast his vote for one, two or three of such designated number of candidates or to cumulate his vote upon one or more of such candidates, he has been deprived of no constitutional right. If the party decides to nominate one candidate for representative in the General Assembly and each member of such party has the right to give one candidate three votes, or if his party decides to nominate two or three candidates and he has the right to

divide his three votes between such candidates, as I under-
stand the *Rouse case,* he has not been deprived of any of
his constitutional rights; and the doctrine on this subject
laid down in that case has never been departed from. In
that case the statute under consideration provided for the
nomination of one candidate for representative in the Gen-
eral Assembly by a primary election and the others (if
more) were to be nominated by a convention, and it was
held this could not be done. In the consideration of that
question, on page 545 of that opinion, it was said: "It
is said, however, that to hold that the voter has the right
to vote at the primary election for more than one candidate
for representative in the General Assembly is to hold that
each party must nominate at least two candidates for rep-
resentative in the General Assembly, if not three, which
would in all the senatorial districts of the State defeat mi-
nority representation, which is established by the constitu-
tion." And it was also said, on page 544 of that opinion:
"Any primary election law, to be valid, which provides for
the nomination of candidates for representative in the Gen-
eral Assembly, must give the voter the right to participate
in the selection of all the candidates of his party for rep-
resentative in the General Assembly which are to be nom-
inated by his party." And again, on page 546: "No law,
as we view the matter, can be constitutional which prevents
the individual voter from participating in the nomination
of all the candidates of his party for representative in the
General Assembly which are to be nominated at a primary
election, if any candidate for representative in the General
Assembly is to be so nominated,"—clearly holding that if
the voter is given the right, by statute, to participate in the
nomination of all candidates of his party for representa-
tive in the General Assembly which are to be nominated by
his party, such statute would be constitutional.

In *People* v. *Strassheim,* 240 Ill. 279, the statute there
under consideration did not give the voter the right to

cumulate his vote, and the statute was held unconstitutional for that reason. The doctrine of the *Rouse case* was not, however, departed from. No new rule was announced, but it was said in that case the statute then under consideration was not in accord with the method pointed out in the *Rouse case* for the making of nominations at a primary election of representatives in the General Assembly. On page 298 this language was used: "The *Rouse case* contains no intimation that the voter may be deprived of his constitutional right to vote for more than one candidate at the primary election or to cumulate his vote. If, as contended by counsel for respondent, the legislature attempted to make section 11 conform to the suggestions in that case, it failed to do so."

Section 11 of the act hereinbefore referred to is, in my judgment, a valid and constitutional law and provides a method for making nominations of candidates for representatives in the General Assembly at a primary election which secures to the voter all his constitutional rights and preserves the principle of minority representation, and as the relator was not nominated as a candidate for representative in the General Assembly he was not entitled to the relief prayed for in his petition for *mandamus*. While I do not agree to all of the reasoning of the opinion of Justices Farmer, Vickers and Cooke, I agree to the conclusion reached in that opinion,—that is, that the writ ought not to issue.

Separate opinion by JUSTICES CARTWRIGHT, CARTER and DUNN:

At the last term of the court a judgment denying a writ of *mandamus* was entered in this case, with a statement that the judgment was concurred in by four members of the court and that the reasons for their conclusion would be given thereafter. The views of Mr. Justice Farmer are expressed in his opinion and are concurred in by the

chief justice and Mr. Justice Cooke. Those views are, that section 11 of the Primary act of 1910 is in conflict with the constitution and void because it gives power to a senatorial committee of a political party to restrict, by resolution, the number of candidates for whom the voters of the party may cast their votes at the election at which representatives in the General Assembly are elected, to a less number than three, thereby depriving such voters of their constitutional right to cast three votes for one candidate or to distribute the same among two or three candidates, as they may see fit; and that any law which would require the names of three candidates of such party to be placed on the ballot at such election if three are voted for at the primary, would be equally unconstitutional and void as destructive of the plan of minority representation. The section in question preserves the right of cumulative voting in the primary election and in that respect is not in violation of the constitution, and the ground of the opinion that it is void is, that the names of no more candidates can be placed on the ballot at the subsequent election than the senatorial committee may determine. Mr. Justice Hand, in the opinion written by him, takes the same views as to the proper construction of the section concerning the power of the senatorial committee and of the invalidity of any act which would require the names of three candidates to be placed upon the ballot at the general election, if that number are voted for at the primary, but holds that power may be given to the senatorial committee to limit the number of candidates for whom voters of a party' may vote at the general election, and that the section is valid.

If we regarded the construction given to the section by the other members of the court as the correct one, we would have no hesitation in saying that it is unconstitutional and void. The provision of the constitution for cumulative voting applied, when adopted, only to general elections, as primary elections were then unknown; but under the rule

laid down in *People* v. *Election Comrs.* 221 Ill. 9, that constitutional right extends to primaries when such elec-tions are created by the General Assembly. The right of cumulative voting extends to primary elections where can-didates for representatives are chosen. Accordingly, we decided in *Rouse* v. *Thompson,* 228 Ill. 522, that a primary election law which permitted the voters of a party to vote for only one candidate for representative was void, as vio-lating the constitutional provision for cumulative voting. Again, in *People* v. *Strassheim,* 240 Ill. 279, another act was held void because it attempted to give authority to senatorial committees to fix the number of candidates for representative for whom the voter of a party might vote at a primary election. The only reason for upholding the constitutional right of the voter in a primary election was, that he had the same right as in the general election. We could not give any satisfactory reason for now reversing our construction of the constitution and holding that while the voter cannot be deprived of his right at the primary, he may be deprived of it by a senatorial committee at the gen-eral election.

But we do not agree with the other members of the court in the construction of section 11, nor in the conclu-sion that a construction which will make it valid will be destructive of the constitutional provision designed to se-cure representation of minorities. When this act was passed, three previous primary acts had been declared void by this court in the cases above referred to, and in two of them a material reason was that the act restricted the right of cumulative voting. It is always presumed that the Gen-eral Assembly is acquainted with the existing state of the law and is informed of previous legislation and the con-struction it has received, (Lewis' Sutherland on Stat. Const. sec. 499,) and in view of the history of primary legisla-tion in this State, the presumption becomes an absolute certainty as applied to this case. There cannot be any

doubt, as it seems to us, that the General Assembly intended to obviate in the new act the objections to the previous acts and to eliminate all unconstitutional provisions. That ought to be the presumption as well on the ground of good faith as because there is always a presumption that legislative bodies do not intend to violate constitutional provisions. The act annulled by the decision in *Rouse* v. *Thompson, supra,* permitted the voter to cast his vote at the primary election for but one representative, and any additional candidate or candidates were to be nominated by a senatorial convention. That scheme was held void, but it was said that we saw no reason why a law might not be framed permitting senatorial committees to suggest the number of candidates to be nominated by their parties and to have the suggestion placed on the ballot for the guidance of the voters. The next act, held void in *People* v. *Strassheim, supra,* provided in section 11 that the senatorial committee of each political party should, by resolution, fix and determine the number of candidates to be nominated by their party at the primary for representative, but the further provision of the same section was, that "each qualified primary elector may cast one vote for each of as many candidates as there are to be nominated by his party as above provided. And the said candidates for nomination highest in votes shall be declared nominated." While this section apparently was intended to comply with the suggestion of the court in *Rouse* v. *Thompson,* its provisions amounted to more than mere suggestion and permitted the voters to cast their votes for only the number of candidates to be nominated, as fixed by the senatorial committee. The act was therefore held to be void. When the General Assembly had under consideration the enactment of another law for holding primary elections, it is presumed they intended the act to be valid and capable of being carried into effect. (Lewis' Sutherland on Stat. Const. sec. 497.) We would not be justified in assuming that it was the intention to re-

enact the same unconstitutional provision and thereby to do a perfectly vain and useless thing. The section was not re-enacted in the same form in the present law, but, instead of the words above quoted, the following was inserted: "Each qualified primary elector may cast three votes for one candidate, or may distribute the same or equal parts thereof among two candidates or three candidates, as he shall see fit. And the said candidate or candidates for nomination highest in votes shall be declared nominated for the office to be filled." The candidate or candidates to be declared nominated are those for whom votes are cast at the primary, and if three candidates are voted for, then by the language of the section they are to be declared nominated for the office to be filled. In solving doubts as to the meaning and intention of the General Assembly, the fact that the previous act had been held bad, and that the language was changed, requires, in our judgment, a different interpretation. The language used in the present act is susceptible of the construction which we give to it, and so construed the provision does not conflict with the constitution. In case of doubtful meaning, a construction should be adopted, if possible, which will reconcile the act with the constitution, and courts will not adjudge an act void unless its violation of the constitution is clear and unmistakable.

Applying the rules of construction which we have stated, under which an act is to be held within the limits of legislative power if it can be done, we think the intention of the General Assembly was that the senatorial committee might adopt a resolution fixing and determining, as a question of party policy, the number of candidates to be nominated by their political party as a matter of advice or suggestion to the individual voter but which was not intended to be binding upon such voter, as this court had distinctly held it could not be. The section declares that each qualified primary elector may cast three votes for one candidate, or may

distribute the same, or equal parts thereof, among two candidates or three candidates, as he shall see fit, and it seems to us unreasonable to say that the General Assembly intended to give to the voters that right, but that their votes should have no influence or effect beyond the number fixed by the senatorial committee.

The construction we give to section 11 does not, in our judgment, interfere with or destroy the plan of the constitution for representation of minorities. Of course, it was not the view of the framers of the constitution, in securing a right to the voter to vote for three candidates or to cumulate his vote, (which was intended to secure minority representation,) that the exercise of the right, or a law securing it, would destroy such minority representation. A political party is a purely voluntary organization of individual voters having the same political beliefs, who combine for the purpose of making their principles effective in the administration of the government. The individual voter cannot be hampered or restrained in the exercise and enjoyment of his rights by the organization, but if he desires the success of his party he exercises his right to effect that object in accordance with the policies of his party and in harmony with the views of the majority. If a party is in the minority in a senatorial district and can elect but one representative, the voter would throw away all benefit of minority representation if he should vote for more than one at the general election. All arrangements governing the action of members of such a party must necessarily be determined by the party organization, and obedience to them must depend upon party loyalty and the hope for party success. The determination of a minority party to vote only for the candidate of that party which received the highest number of votes in the primary election would be observed by every loyal member of the party and accomplish the ends intended by the framers of the constitution. Voters who would disregard the plan so determined upon

would not and could not be controlled by any act forbidding them to vote at the general election for a greater number of candidates than should be specified by the senatorial committee.

In our opinion section 11 of the act under consideration is valid, and the peremptory writ ought to have been awarded.