415 F.2d 1291
 Sherman H. SKOLNICK, George Eskelinen, and Leon M. Despres, Plaintiffs,
v.
MAYOR AND CITY COUNCIL OF CHICAGO, and Board of Election Commissioners of Chicago, Defendants-Appellees.
Sherman H. Skolnick and George Eskelinen, Plaintiffs-Appellants.
 No. 17181.
 United States Court of Appeals Seventh Circuit.
 August 18, 1969.
 
 Sherman H. Skolnick and George Eskelinen pro se.
 Robert L. Stern, Julian B. Wilkins, James P. Chapman, Chicago, Ill., for amicus curiae.
 Raymond F. Simon, Corp. Counsel, Stanley T. Kusper, Jr., Edmund Hatfield, Chicago, Ill., for defendants-appellees Mayor and City Council of Chicago; Marvin E. Aspen, Asst. Corp. Counsel., Chicago, Ill., of counsel.
 Before HASTINGS, Senior Circuit Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.
 HASTINGS, Senior Circuit Judge.
 
 
 1
 Plaintiffs Sherman H. Skolnick and George Eskelinen filed an amended complaint in the United States District Court for the Northern District of Illinois, Honorable William J. Campbell, Chief Judge Presiding. Plaintiffs are not lawyers and have appeared and acted pro se throughout this proceeding. Each is a citizen and legal resident and voter of the City of Chicago, Cook County, State of Illinois. They brought this action on behalf of themselves and as a class action on behalf of all other voters, persons, citizens, residents and taxpayers similarly situated.
 
 
 2
 Named as defendants are the Mayor and City Council of Chicago and the Board of Election Commissioners of Chicago. It is alleged that the City of Chicago is a municipal corporation operated by the Mayor, who is president of the City Council of Chicago, and fifty aldermen who comprise the membership of the City Council, and all of whom are elected by the legal voters of the City of Chicago pursuant to appropriate statutes of the State of Illinois. It is alleged that the defendant Board of Election Commissioners of Chicago is charged with the responsibility of conducting elections in Chicago.
 
 
 3
 In substance, the amended complaint challenges the constitutional validity of the existing ward lines of the City of Chicago as drawn by the City Council in 1961 and alleges further that the existing wards of the City of Chicago are not in conformity with the constitutional "one man-one vote" standards formulated and announced after the wards were last reapportioned in 1961. See Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and its progeny.
 
 
 4
 Plaintiffs seek equitable relief (1) voiding the city election of the Mayor and City Council in 1967; (2) ordering a special city election based on constitutionally reapportioned districts; (3) restraining the Board of Election Commissioners from proceeding further under present districts; (4) restraining the Mayor and City Council from acting further until a constitutionally proper reapportionment of the city wards takes place; and (5) praying the district court to retain jurisdiction on such basis as it may deem proper.
 
 
 5
 Subsequently, pursuant to Rule 23, Federal Rules of Civil Procedure, 28 U.S. C.A., the district court found, sua sponte, that the amended complaint properly presented claims or defenses of the representative parties common to the class represented. The court further found that the pro se plaintiffs, although properly credited for having commenced this action, were not qualified to adequately represent the interests of other members of the class who needed such representation because of the importance of the issues raised. Accordingly, in compliance with the requirements of Rule 23(a) (4)[1], supra, the court appointed the Chicago Bar Association amicus curiae herein and directed that, through its proper representatives it provide proper protection of the rights and interests of all of the voters of Chicago in this case.
 
 
 6
 The district court ordered that the defendant Leon M. Despres, a member of the City Council of Chicago, be realigned as a party plaintiff since he had embraced the position taken by plaintiffs on the issue of malapportionment of the city wards.
 
 
 7
 Thereafter, following the holding in Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), making the "one man-one vote" principle of Baker v. Carr, supra, applicable to municipalities of a state, the district court found that the appointment of two special commissioners to assist the court would be in the public interest. Accordingly, the court appointed Richard E. Friedman, Esq. and Don H. Reuben, Esq., "Special Commissioners of this court to marshal all factual information now available and the various suggestions of the parties; to conduct such hearings as in their discretion may be necessary to formulate their own observations and suggestions on the entire matter; and to report to the court as soon as possible." It clearly appears that Messrs. Friedman and Reuben are distinguished members of the Chicago Bar who have rendered similar expert assistance in several prior Illinois reapportionment cases.
 
 
 8
 Defendants Mayor and City Council promptly filed a status report with respect to the progress they had made in consideration of the necessity of reapportioning the wards of the City of Chicago as previously ordered by the court.
 
 
 9
 The Chicago Bar Association as amicus curiae was represented throughout this proceeding, and on appeal, by its attorneys, Robert L. Stern, Julian B. Wilkins and James P. Chapman, highly reputable members of the Chicago Bar.
 
 
 10
 The Special Commissioners filed an interim report recommending denial of plaintiffs' motion to enjoin a special election to be held in the City of Chicago on June 11, 1968 to fill a vacancy in the City Council occasioned by the resignation of the alderman for the First Ward of Chicago. Subsequently, after hearing the matter, the district court overruled plaintiffs' objections and denied their motion to enjoin the special election to fill such vacancy.
 
 
 11
 Thereafter, in compliance with a prior order of the district court, the Special Commissioners held a public hearing on May 7, 1968 on the merits of the case. Plaintiffs were present in person and defendants and the amicus were represented by counsel. All witnesses and the parties were fully heard. The Special Commissioners took the matter under advisement, including the several written and statistical studies and reports received in evidence.
 
 
 12
 The Special Commissioners filed their interim report on the merits with the district court on July 27, 1968, which we set out in full in the margin.[2] As appears therein, the Special Commissioners found that the existing ward lines of the City of Chicago, as drawn by the City Council in 1961, were not in conformity with the mathematical "one man-one vote" constitutional standards judicially formulated and determined subsequent to the 1961 redistricting. Thus, on that issue the finding was favorable to plaintiffs' contentions. The Special Commissioners further recommended that the district court order each of the parties to file their suggestions to the court concerning an appropriate remedy in light of their report.
 
 
 13
 On July 30, 1968, the district court entered an order approving the interim report of July 27, 1968 and adopting the findings and recommendations of the Special Commissioners, which order appears in full in the margin.[3] As appears therein, the parties were given leave to file their suggested plans "to constitutionally remedy the malapportionment of the City's wards" not later than August 29, 1968, and to further file suggestions concerning an alternative remedy.
 
 
 14
 Thereafter, certain of the parties and Dr. Joseph R. Godwin, who testified as an expert witness, filed suggestions as requested by the district court. On September 11, 1968, the trial court filed its memorandum and entered its order determining this cause, which appear in full in the margin.[4] As appears therein, the district court restated its finding that the existing wards were malapportioned, and then proceeded with its determination of an appropriate remedy.
 
 
 15
 In short, the trial court ordered (1) that defendants be enjoined from conducting any further elections for the office of Alderman of the City of Chicago, except special elections in individual wards to fill individual term vacancies, under the present apportionment ordinance; (2) that defendant City Council report to the trial court on October 1, 1970 whether it has available adequate information to draft a fair and constitutionally valid reapportionment ordinance; (3) that defendant City Council file with the trial court on or before November 1, 1970, a "fully detailed and lawfully enacted redistricting ordinance based on the 1970 census figures and conforming with the requirements of the United States Constitution; and (4) that the trial court retain jurisdiction of the cause to fully carry into effect its orders.
 
 
 16
 Plaintiffs appeal only from that part of the judgment order "delaying the remedy in the above case."
 
 
 17
 Realigned plaintiff Despres and defendants do not appeal from any part of the judgment.
 
 
 18
 On this appeal, plaintiffs appear pro se and defendants appear by counsel. They have filed briefs. Realigned plaintiff Despres does not appear in this court. We granted leave to the amicus curiae appointed by the trial court to file a brief in this court and by its designated counsel it has done so.
 
 
 19
 All parties and the amicus agree that the trial court properly found and determined that the present apportionment ordinance of the City of Chicago is unconstitutional. We agree. It is not necessary to further discuss that issue here.
 
 
 20
 In the interim, on October 1, 1968 this court in a memorandum order denied plaintiffs' motion for summary action voiding the 1967 aldermanic elections and ordering an at-large election of all 50 aldermen at the general election on November 5, 1968.
 
 
 21
 On November 14, 1968, plaintiffs filed in this court a motion to enjoin the City of Chicago from holding special elections early in 1969 to fill five aldermanic vacancies and in effect to expedite the hearing of this appeal.
 
 
 22
 On November 20, 1968, this court denied the request for injunctive relief, but we ordered an early briefing schedule and set this appeal for oral argument on January 7, 1969 in compliance with plaintiffs' request.
 
 
 23
 On November 29, 1968, similar injunctive relief was denied by Mr. Justice Marshall in the Supreme Court.
 
 
 24
 In answer to our order of November 20, 1968, defendant Board of Election Commissioners of Chicago filed in writing a statement that its only function is to conduct elections pursuant to Illinois law; that it has no interest in these proceedings on appeal, but stands ready and willing to obey the orders of the court.
 
 
 25
 Prior to the expedited hearing date of January 7, 1969, plaintiff Skolnick moved for the disqualification of Judges Hastings and Cummings from participating further in this case. On January 3, 1969, Judges Hastings and Cummings each declined to disqualify and withdraw and denied such motion.
 
 
 26
 Thereafter, on January 6, 1969, this court granted plaintiff Skolnick's motion to stay all proceedings in this action pending his further proceeding in the Supreme Court, and accordingly all proceedings on appeal were ordered stayed until our further order. The expedited hearing date was thereby vacated.
 
 
 27
 On March 13, 1969, following denial of relief in the Supreme Court, we granted plaintiff Skolnick's motion for a hearing on appeal at an early date, vacated our stay order of January 6, 1969 and ordered the cause to be set for oral argument at the April, 1969 Session. Thereafter, the cause was set for oral argument and heard on May 2, 1969.
 
 
 28
 The cause was personally argued by plaintiff Skolnick and by counsel for defendants Mayor and City Council of Chicago and thereupon was taken under advisement. Also taken under advisement at oral argument was a motion filed by plaintiff Skolnick at the time of oral argument for leave to file for consideration by the court as a part of the record on appeal eight pages "of Affidavits of community leaders, showing yet another reason for remapping the defendant City Council of Chicago at the earliest date." Although such affidavits were not timely filed and are not a part of the record below and properly before us on this appeal, in view of the asserted interest of affiants in this proceeding we have determined to order them filed as a part of the record under consideration herein. It is so ordered.
 
 
 29
 We have carefully considered the entire record in this case. We find therefrom some facts to be clearly established.
 
 
 30
 The present City Council was elected for four years in 1967. The next regularly scheduled election will be conducted on February 23, 1971. The Illinois statutes require the petitions for candidates be filed 64 days before the election, or about December 21, 1970. Obviously, prospective candidates must be given a reasonable time after ward boundaries are fixed by the ordered reapportionment to obtain the necessary signatures on nomination petitions.
 
 
 31
 The 1970 decennial census is to be taken by April 1, 1970 under the auspices of the Census Bureau. The City of Chicago is divided into over 600 tracts for census purposes, the population of each tract to be computed before transmitting the data to central headquarters where a block by block breakdown is finally made.
 
 
 32
 The original tract figures, accurate within 1%, should be available by August 1, 1970. However, the final and highly accurate block data may not be available until early 1971. Defendant City Council represents that figures for smaller districts (enumeration districts) will be available prior to October 1, 1970 and that other additional helpful census data may be available by the October 1, 1970 date. Inability to obtain more accurate data so soon after the census would appear to be adequate justification for the use of the tract figures to permit ward populations to be kept reasonably close. We agree with the conclusion of the trial court and the presentation on brief of the amicus that a fair and lawful apportionment plan can be drawn from the 1970 census tract figures.
 
 
 33
 It seems clearly established the only reliable method to determine the City's present population would be by a special census, that is by a physical "head count." It also is established that no reliable studies are available at this time for use in achieving acceptable population figures for any ward or other segment of the city.
 
 
 34
 It is shown that expense of undertaking a complete special census would approximate the sum of $800,000. Further, there can be no assurance that the Census Bureau could or would undertake such a project at this late date in view of the close proximity of the next regular census to be taken as of April 1, 1970. It is shown that eight months time would be required to organize, conduct and finally complete such a project.
 
 
 35
 Further, a special census could be justified only for the purpose of holding a special aldermanic election prior to the next scheduled election on February 23, 1971. It is shown that such an election would cost an estimated $800,000, and more if a run-off is required in any ward.
 
 
 36
 It is apparent that the time required for a reapportionment on the basis of a special census and the additional time needed to prepare for an election, with all the procedures there involved, would consume a period of approximately six months.
 
 
 37
 Taking into consideration the relatively brief time such a newly elected City Council could serve prior to the February, 1971 election, together with expense and difficulties inherent in taking a special census and conducting a special election, under the facts of the instant case, we are compelled to the conclusion that such a course of action cannot be reasonably justified.
 
 
 38
 It is certain that a reapportionment based on the 1960 census figures could not be used for present reapportionment of the wards. All would agree they are not reliable because of obvious and substantial population changes and shifts since 1960. No relevant supplemental data has been shown to be available.[5] This is but another way of saying again that a physical "head count" has been shown to be the only reliable method which can be used.
 
 
 39
 Plaintiff on oral argument proposes that the 1960 census figures could be adequately updated and available for present use with a computer. However, it is not made clear to us how such an operation could achieve an acceptable result. Such a proposal would seem to be founded on surmise and conjecture.
 
 
 40
 The amicus suggested to the trial court that defendant City Council should submit its plan of reapportionment to the court by September 15, 1970, a date which the court changed to November 1, 1970. It renews its suggestion to us by brief on appeal.
 
 
 41
 On the one hand, it appears the trial court had real doubt that the defendants would have available the necessary census data to complete, enact and report its redistricting ordinance based on the 1970 census figures prior to November 1, 1970. On the other hand, the amicus has a real doubt that the district court has allowed itself sufficient time to reapportion the wards so that the election procedure schedule may be complied with in the event the City Council does not report a lawful reapportionment plan as presently ordered.
 
 
 42
 We recognize the difficulties inherent in either filing date. We also are well aware of the absolute necessity of having the reapportionment plan, based on the 1970 census, available for use in the February, 1971 election. Our genuine concern is that the City Council comply with the court's order without delay after sufficient census data becomes available.
 
 
 43
 On balance, we have concluded that the district court's order should be modified to require the defendant City Council to file its redistricting ordinance on or before October 1, 1970, in lieu of November 1, 1970, and that its prior reporting date on the availability of adequate information be advanced from October 1, 1970 to such time as the district court may determine. Our modification is not intended to prohibit the district court from granting reasonable extensions of the filing date if in the exercise of its discretion the court should determine that on the basis of the facts as they then exist such course would be the most expeditious way of insuring that a workable plan would be available in time for the scheduled election.
 
 
 44
 Since the district court retains jurisdiction of this cause to fully carry into effect its orders, the foregoing modification will enable the court to earlier elect to prepare its own reapportionment plan or otherwise take such steps as it shall deem advisable under the circumstances then existing.
 
 
 45
 Plaintiffs urge that the recent holdings in Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (April 7, 1969), Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1239, 22 L.Ed.2d 519 (April 7, 1969), and Swann v. Adams, 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966), are in support of their contention that the City Council should submit a reapportionment plan now. We do not so read them.
 
 
 46
 Without great elaboration of the facts and history of these three cases, suffice it to say that they are distinguishable from and not dispositive of the necessary remedy in the instant case.
 
 
 47
 In 1967, the Supreme Court in Rockefeller v. Wells, 389 U.S. 421, 88 S.Ct. 578, 19 L.Ed.2d 651 (1967) affirmed the conclusion of the three-judge district court which held that a New York congressional redistricting plan was unconstitutional in that there was not substantial equality of population among congressional districts. In affirming, the Supreme Court implicitly approved of the lower court's remedy. In designing its remedy, the lower court recognized that the 1960 census figures could not serve as an effective foundation for a reapportionment plan due to the fact population does not remain static over the years and that "accurate congressional representation must await the 1970 census * * *." However, in view of the Supreme Court decision in Swann v. Adams, 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 767 (1966), the court determined that since congressional elections were to be held prior to the 1970 census a compromise had to be forged. Thus, the court decided that with the figures then available "there are enough changes which can be superimposed on the present [malapportioned] districts to cure the most flagrant [constitutional] inequalities." The court therefore ordered that such changes be superimposed and directed the 1968 New York legislature to devise a reapportionment plan which would provide for constitutionally valid congressional districts. By implication however, the Court recognized that a realistic reapportionment could not take place without the 1970 census figures. Such an implication may be drawn from the court's statement that "even if perfection cannot be achieved between now and 1973 [the date upon which accurate redistricting could be achieved based upon the 1970 census figures], improvement is worth the effort."
 
 
 48
 As a result of the 1967 decision, the 1968 legislature convened and enacted a law establishing new congressional districts based on the then available population figures, basically the 1960 census figures. In Wells v. Rockefeller, 281 F. Supp. 821 (D.C.1968), a three-judge court upheld this enactment saying that "[t]he gross population disparities, which were the source of plaintiffs' original complaint and which brought about a declaration of unconstitutionality, have been remedied * * *." The lower court sustained the apportionment enactment for use in the 1968 and 1970 congressional elections. The Supreme Court in its recent decision of Wells v. Rockefeller, supra, reversed the district court's judgment insofar as it sustained the plan for use in the 1970 congressional election. With respect to proceeding under the plan for the 1968 election, the Supreme Court stated: "Since the 1968 primary election was only three months away * * *, we cannot say that there was error in permitting the 1968 election to proceed under the plan despite its constitutional infirmities."
 
 
 49
 The history of the Swann litigation began in 1962. In Swann v. Adams, 378 U.S. 553, 84 S.Ct. 1904, 12 L.Ed.2d 1033 (1964), the Supreme Court reversed the judgment of a three-judge district court upholding the then current statutory apportionment of the Florida legislature. Sobel v. Adams, D.C.S.D.Fla., 214 F. Supp. 811 (1963). Thereafter, the Florida legislature in 1965 enacted a new reapportionment plan which the district court held unconstitutional but approved with minor modifications, on an interim basis, limiting the plan's duration to the period ending 60 days after the adjournment of the 1967 regular session of the Florida legislature. In the case cited on brief by appellants, Swann v. Adams, 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966), the Supreme Court reversed the district court judgment as to the conceded unconstitutional apportionment stating that "* * * in approving the [1965] plan on an interim basis, the District Court erred. * * * we find no warrant for perpetuating what all concede to be an unconstitutional apportionment for another three years." The Supreme Court remanded the cause so that a valid reapportionment plan could be devised for the upcoming 1966 Florida legislative elections.
 
 
 50
 The last chapter in the Swann litigation indicates the Florida legislature met in special session in March 1966 and passed another reapportionment plan which the district court upheld. Swann v. Adams, D.C.S.D.Fla., 258 F.Supp. 819 (1966). The Supreme Court reversed the district court in Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967).
 
 
 51
 The district court's order in this case does not offend the Supreme Court decisions in Wells and Swann for the following reasons.
 
 
 52
 In Wells, the Supreme Court allowed the 1968 New York congressional election to proceed under an unconstitutional apportionment plan for pragmatic reasons, namely, there was not sufficient time available prior to the 1968 election to remedy the plan's constitutional infirmities. The Supreme Court however did order a constitutional reapportionment for the 1970 election since "ample time remains to promulgate a plan * * before the election machinery must be set in motion for the 1970 election." Similarly in this case ample time remains to promulgate a constitutionally valid plan before the next general aldermanic election in 1971. Such a plan can be promulgated based on the 1970 census figures.
 
 
 53
 The Swann case may be distinguished from the instant case by the fact an intervening general election (the 1966 Florida legislative election) was scheduled at the time of the Supreme Court decision and thus the Supreme Court felt compelled to order a constitutional reapportionment prior to the election. Here, a general election is not scheduled before the new reapportionment plan is to take effect. Thus, the Swann decision and the trial court's order in the instant case may be reconciled.
 
 
 54
 The recent Supreme Court decision, Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), is not relevant to the remedial disposition of this case. In that case, the Supreme Court simply affirmed the lower court's finding that Missouri's legislative reapportionment plan with respect to congressional districts was unconstitutional in its failure to achieve the greatest equality possible among such districts. The decision is not apposite to the "timing" of the remedy in the instant case.
 
 
 55
 For the foregoing reasons, the judgment of the district court will be modified as herein directed and as modified will be affirmed. This cause is remanded to the district court for continued jurisdiction.
 
 
 56
 Affirmed as modified and remanded.
 
 
 
 Notes:
 
 
 [1]
 Rule 23(a) (4) provides:
 "(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if * * * (4) the representative parties will fairly and adequately protect the interests of the class."
 
 
 [2]
 "INTERIM REPORT OF SPECIAL COMMISSIONERS ON THE MERITS
 "May It Please the Court:
 "Pursuant to the order of this Court, the undersigned render their report in the above-captioned cause. The parties and amicus curiae have all concluded their presentations and, insofar as we have been advised, there is no further evidence or argument that any one wishes to offer.
 "The issue in this suit is the constitutional validity of the existing ward lines of the City of Chicago, as initiated and drawn by the City Council in 1961, when mirrored against the constitutional `one man-one vote' principle formulated and announced after the wards were last reapportioned. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). We find the wards as drawn are not consonant with the mathematical criteria established by the courts after the decision in Baker v. Carr, supra, and subsequent to the redistricting of the wards in 1961.
 "The total population of the City of Chicago according to the 1960 census was 3,550,404; since there are 50 wards the population mean is 71,008. Although the parties have not agreed as to the mathematically precise totals of all ward populations, it appears that the largest ward is the Twenty-First with a population of approximately 80,299, a deviation of 13 percent above the mean; the smallest ward is the Forty-Second with a population of approximately 60,229, a deviation of 15 percent below the mean. The total deviation between the largest and smallest wards is nearly 33 1/3 percent. We can find no cases sustaining such a wide range of deviations. Compare Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); Maryland Citizens Committee v. Tawes, 253 F. Supp. 731, (D.C.1966); League of Nebraska Municipalities v. Marsh, 242 F.Supp. 357 (D.C.1965); Paulson v. Meier, 246 F.Supp. 36 (D.C.1965). The deviations are clearly impermissible unless the City can affirmatively demonstrate sound reasons or justification in defense. Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed. 45 (1968).
 "The City has adduced statistics relating to demolition and construction of residential buildings subsequent to the 1960 Federal census. The statistics tend to establish that substantial increases and decreases in population have occurred within various sectors of Chicago and that the population totals of many wards have drastically changed. However, as the City itself recognizes, its statistics are at best estimates and cannot be a predicate for either sustaining the present ward map or the drawing of a new one. The City's statistics only show that extensive and graphic population changes have unquestionably occurred since the 1960 census.
 "At present the only mathematical data available for a redistricting are the 1960 Federal census figures, and the evidence adduced by all parties discloses that these figures are now largely historical and do not accurately reflect existing ward populations.*
 
 
 *
 The plaintiffs' own evidence shows that neither building statistics nor voter registration figures sufficiently correlate to actual population totals to permit the use of either. Moreover, all sides seem to agree that there is no assurance whatsoever that the 1960 census figures are now accurate. We thus find that redistricting of the City of Chicago's wards upon the basis of the 1960 census could easily create malapportionment deviations and inequalities in fact greater and more undesirable than those under the existing ward map
 "The suggestion has been made that a special Federal census be taken, prior to the 1970 census, and that a special election then be conducted upon the basis of the special census figures. If the City could spend the money for such a census (estimated at between $600,000 and $700,000) and if other commitments of the Bureau of Census would permit the census to be taken, the figures would not be available until sometime in the first quarter of 1969 — less than a year from the regular 1970 Federal census. (The special census would of course be completely supplanted by the official 1970 figures that would then be one year more current.)
 "Once special census figures were obtained and a new map drawn upon such figures, a special aldermanic election in 1969 would cost the city approximately $825,000, plus $16,500 per ward for each aldermanic run-off election that might be necessary. In view of the substantial expense involved, the imminence of the 1970 census, and the shortness of time, we believe that a special census is not an appropriate solution. Moreover, we have doubt as to whether this Court or any Court could compel the City to spend the substantial sums of money necessary to obtain a special census from the Bureau of the Census. And, the Court certainly could not compel that Bureau to take a special census if the Bureau concluded it either could not do so by early 1969, or could not do so at all, because of other commitments.
 "Before making a recommendation of an appropriate remedy to the Court, the Commissioners respectfully request that the Court order each of the parties to file their suggestions concerning a remedy in the light of the above report.
 Respectfully submitted,
 /s/ Richard E. Friedman,
 Richard E. Friedman,
 /s/ Don H. Reuben,
 Don H. Reuben,
 Special Commissioners.
 Dated: July 29, 1968."
 
 
 [3]
 
 "ORDER
 "Having received and reviewed the Interim Report of the Special Commissioners covering the Hearing on the Merits, filed by them subsequent to the presentation of evidence and arguments by all parties to this cause, I am in agreement with and hereby adopt the Commissioners' finding that the existing wards of the City of Chicago are not in conformity with the mathematical `one man — one vote' standards that have been judicially formulated subsequent to the last redistricting of the wards in 1961. I also agree with and adopt the Special Commissioners' recommendation that the parties submit any further suggestions concerning an appropriate remedy.
 "Accordingly, all parties are hereby given leave to file with the Court no later than August 29th, 1968, a detailed and complete plan to constitutionally remedy the malapportionment of the City's wards.
 "Since none of the parties herein have as yet addressed themselves to an obvious alternative remedy that would not necessitate waiting for either a new census to be taken or a new ward map to be drawn, i. e., the election of all Chicago Aldermen from the City at large at the next general election; all parties are therefore also given leave to file with the Court no later than August 29th, 1968 any suggestions concerning the advisability and legality of such alternative remedy.
 Enter:
 /s/ Campbell,
 Chief Judge.
Date: July 30, 1968."
 
 
 [4]
 
 "MEMORANDUM AND ORDER
 "Campbell, C. J.
 "In my order of July 30, 1968, herein I expressed agreement with and adopted the report of the Special Commissioners finding that the existing wards of the City of Chicago are not in conformity with the mathematical `one-man one-vote' standard and invited all parties so desiring to file a `detailed and complete plan to constitutionally remedy the malapportionment of the City's Wards'. I also solicited suggestions as to the legality or advisability of the election of all Chicago Aldermen in an at-large election at the next general election. Pursuant thereto certain of the parties, as well as an expert witness who appeared and testified herein, have filed such suggestions for which I am grateful.
 "Upon careful review of these suggestions, as well as the entire record of the proceedings herein, I have concluded, for reasons I hereinafter discuss, that the legal and appropriate remedy in this case is to enjoin any further elections under the present apportionment ordinance and to order the City Council to prepare and adopt a constitutionally valid apportionment plan in time to be used in the next regular election of that body presently scheduled for February, 1971.
 "Dr. Joseph R. Godwin, who testified in this proceeding as an expert witness and very ably served this court in previous reapportionment problems, (Illinois State Senate and United States House of Representative Districts) submitted a very thoughtful and thorough apportionment plan based on 1960 census figures. Although I commend and thank Dr. Godwin for his efforts, I find his plan unacceptable in light of the evidence presented by all parties in this case that due to recent construction, demolition and redevelopment trends and general population movements throughout the City of Chicago, the 1960 census figures no longer portray the present population scheme. (e. g., See testimony of plaintiff Skolnick's witness Sherman, Hearing of May 28, 1968; Brief of defendant, City Council, filed June 6, 1968; Memorandum for the Chicago Bar Association; amicus curiae, filed June 10, 1968; Interim report of Special Commissioners filed July 29, 1968.)
 "Plaintiff Skolnick has filed a one page statement in which he urges that an atlarge election be held in November 1968. Upon reflection and in light of the reasons advanced by other parties opposing an at-large election (See supplemental memorandum for Chicago Bar Association, amicus curiae, filed August 9, 1968; and suggestions of defendant City Council, filed August 29, 1968.) I have decided against such a solution.
 "I should point out that the briefs of the Amicus Curiae and the defendant City Council as well as the cases cited therein, stress that the at-large election is a harsh remedy which should be reserved for the most flagrant cases of malapportionment. Plaintiff Skolnick, apparently attempting to show this case as a flagrant one, argues that the City Council has engaged in `unreasonable delay' because they `had since 1966 when this suit was filed to come in with a remap plan.' [sic.]
 "This statement, I believe, requires clarification of the record of this proceeding. The initial complaint in this proceeding was filed November 22, 1966, but because it improperly attempted to invoke the jurisdiction of a three judge court, it was dismissed. (Order June 12, 1967) The amended complaint properly invoking the jurisdiction of this court, was not filed until July 17, 1967.
 "Furthermore, the mere filing of a complaint, without more, certainly did not require the City Council to take steps to reapportion itself. Particularly when the threshold question, i. e., whether the one-man one-vote principle applied to municipalities and other political subdivisions of a state, was still undecided and was not finally determined until April 1968. (Avery v. Midland County Texas, 390 U.S. 474 [88 S.Ct. 1114, 20 L.Ed.2d 45]).
 "In fairness to the defendant City Council, I should further point out that as early as July 7, 1967, before the amended complaint was filed and some nine months before the Supreme Court's decision in Avery the City Council initiated a study by its Committee on Committees and Rules to determine the necessity or desirability of redistricting. (See Order of this court December 15, 1967) This is not the conduct of a body bent on delay.
 "Plaintiff Despres, appearing individually urges this court to order an at-large election to be held in November of 1969 unless a satisfactory plan is presented by July 16, 1969. His admitted purpose is to use the possibility of an at-large election as a threat to assure proper apportionment immediately. His proposal would require the City to undertake the expense of a complete special census. He argues that the expenditure of $800,000 of city tax monies to accomplish a special census is `slight' in comparison with other considerations which call for a constitutionally apportioned Council. He ignores a possible additional expenditure of more than $800,000 which would be necessary to conduct any special election held after the special census figures were available. Since none of this could be accomplished before mid-year 1969, I am unwilling to order the expenditure of such vast sums of City tax monies merely to provide mathematically perfect apportionment for what would be the relatively short remainder of the present term. Nor do I believe that a special census is necessary to assure a proper apportionment plan in time for the next regularly scheduled election of the City Council.
 "The next general election for the City Council is scheduled to be held on February 23, 1971, with candidates' petitions due to be filed December 21, 1970. The 1970 census shall be taken as of April 1, 1970. While final and accurate block by block figures may not be available until early 1971, larger tract figures will be available by August 1, 1970. I am convinced, from the testimony of the witnesses and the arguments of the parties, particularly the amicus curiae, that a fair and lawful apportionment plan can be drawn from the census tract figures. The City Council also represents that figures for smaller districts (enumeration districts) will be available prior to October 1, 1970 and that other helpful census data will be available by that time. If for some reason accurate census figures are not available in time to assure the preparation and adoption of a constitutionally valid plan or if the City Council fails speedily to adopt a valid plan as hereinafter required this court shall again consider all available remedies including the preparation of an apportionment plan of its own. In such an alternative I would, of course, call upon the valuable services of Dr. Godwin and the Special Commissioners who have been such a valuable help throughout this proceeding.
 "Accordingly, it is ordered:
 (1) Defendant City Council and defendant Board of Election Commissioners of Chicago shall conduct no further elections for the office of Alderman of the City of Chicago under the present apportionment ordinance. However, special elections, in individual wards to fill individual term vacancies may be conducted. (See Order of May 17, 1968)
 (2) Defendant, City Council of the City of Chicago, shall report to the Court on October 1, 1970 whether it has available adequate information to draft a fair and constitutionally valid reapportionment ordinance.
 (3) Defendant, City Council of the City of Chicago, shall on or before November 1, 1970, file a fully detailed and lawfully enacted redistricting ordinance based on the 1970 census figures and conforming with the requirements of the United States Constitution.
 (4) This court retains jurisdiction of this cause to fully carry into effect the foregoing.
 Enter:
 /s/ Campbell,
 Chief Judge.
Dated: September 11, 1968."
 
 
 [5]
 For this reason the recent decision of a three-judge court in Chavis v. Whitcomb, No. IP69-C-23 (S.D.Ind. July 28, 1969), is not apposite