**Sherman H. SKOLNICK and Harriet Sherman, Plaintiffs,**

v.

**ILLINOIS STATE ELECTORAL BOARD, Defendant.**

**No. 69 C 902.**

United States District Court
N. D. Illinois, E. D.

Dec. 1, 1969.

Skolnick and Sherman appeared pro se.

Chicago Bar Association by John J. Sullivan, and James P. Chapman, Chicago, Ill., appeared as amicus curiae.

Don H. Reuben, Esq., Lawrence Gunnels, Chicago, Ill., and John E. Cassidy, Jr., Peoria, Ill., for defendant.

## MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECREE

Before FAIRCHILD, Circuit Judge, and CAMPBELL and AUSTIN, District Judges.

### PER CURIAM.

Plaintiffs acting *pro se* have brought this action on their own behalf and on behalf of, "all other voters, residents, citizens, taxpayers and persons similarly situated", and seek to set aside the present apportionment plans of the Illinois Senate and House of Representatives, both of which were adopted in 1965, alleging that these plans do not comply with the most recent constitutional standards for apportionment as set forth in the United States Supreme Court decisions of Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969) and Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). In what is captioned a "Correction or Amendment of Complaint" plaintiffs also argue that the cumulative voting provisions of the Constitution of the State of Illinois (Art. IV Sec. 7) also "disenfranchises plaintiffs and others similarly situated."

Upon filing of the complaint it was properly determined by Judge Richard B. Austin, to whom the case was assigned, that this was a matter which must be heard by a three judge court pursuant to 28 U.S.C. Sec. 2284. Subsequently and pursuant to Sec. 2284 the Chief Judge of the United States Court of Appeals for the Seventh Circuit designated the members of this panel to hear and determine this action.

In response to the complaint the defendant, Illinois State Electoral Board, filed a motion to dismiss the complaint for failure to state a claim upon which relief may be granted. Defendant subsequently filed an extensive brief in support of its motion to dismiss. Noting that plaintiffs are not attorneys nor represented by attorneys, we appointed the Chicago Bar Association, *Amicus Curiae,* with the direction that they were

to represent and protect the interests of all members of the class. Pursuant to that appointment the President and Board of Managers of the Association designated immediate Past President John J. Sullivan, Esq. and James P. Chapman, Esq., both able and experienced trial attorneys to serve as *Amicus* and to represent the class. Mr. Chapman and the Association previously served this Court as *Amicus Curiae* in a similar case challenging the constitutionality of the ward lines of the City of Chicago. His able assistance in that case and that of the Association was noted both by Judge Campbell and by the Court of Appeals.

Upon appointment, the *Amicus Curiae* filed a brief in opposition to the defendant's motion to dismiss and the matter was immediately set for argument. All parties, plaintiffs *pro se,* defendant and *Amicus Curiae* were fully heard.

The Senate districts here challenged were judicially formulated by this court and by the Supreme Court of Illinois in unprecedented mutual and cooperative decisions. Germano v. Kerner, 247 F. Supp. 141 (N.D.Ill.1965) and People ex rel. Engle v. Kerner, 33 Ill.2d 11, 210 N.E.2d 165 (1965). Immediately after the present Senate map was promulgated, districting of the House of Representatives was adopted by a Special Reapportionment Commission appointed pursuant to the Constitution of the State of Illinois (Art. IV Sec. 8). The Representative districts for Cook County, as adopted by the Special Commission, are co-terminous with the judicially formulated Senate districts adopted by this court and the Illinois Supreme Court. The Representative districts in the remainder of the state vary at least slightly from the judicially adopted Senate districts. Some variations were necessary because there are 59 Representative districts and only 58 Senate districts in the State of Illinois. Both the Senate and the House maps were based on 1960 federal census figures. The Senate districts were determined at that time to be in complete compliance with the federal constitutional principle of "one man-one vote" as expressed in the then most recent Supreme Court decisions, particularly Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964). See Germano v. Kerner, 247 F.Supp. 141, 143. The variations or deviations from the average population in those Senate districts are as high as 7.7 per-cent above and 7.0 per-cent below the average. The House districts contain variations as high as 8.6 per-cent above and 8.3 per-cent below the average population.

The 1966 election for members of the Senate was conducted on the basis of the judicially formulated map. All 58 Senate seats were filled for a four year term at that election notwithstanding the provision of the Illinois Constitution for staggered terms of Senators. With regard to the constitutional requirement for staggered terms, the Illinois Supreme Court held, "To judicially provide for staggered terms in a temporary redistricting scheme would unduly and unnecessarily encroach upon the legislative domain". (33 Ill.2d 11 at 14, 210 N.E.2d 165 at 167). For that reason the court determined that all 58 Senators should be elected in 1966 and thereafter "for identical four-year terms until such time as 1970 census figures become available for legislative action." (Id.) Accordingly, and as stated above, all Senators were elected to four year terms in 1966 and those terms expire in 1970. Elections for the Illinois House of Representatives were conducted pursuant to the Commission drawn map in 1966 and 1968. Members of the House are elected for terms of two years under the Illinois Constitution. (Art. IV, Sec. 7). Thus all 177 Representatives must be again elected in 1970 for a two year term expiring in 1972. Under state law prospective candidates for both the Senate and the House of Representatives must file their initial petitions for the November 1970 election after December 8, 1969, but no later than December 15,

1969. Candidates with properly filed nominating petitions will be certified on January 15, 1970. Primary elections are scheduled by statute to be held on March 17, 1970.

In support of its motion to dismiss, defendant State Electoral Board argues first that the present maps for both the Senate and the House are constitutionally valid. Defendant also argues that the relief sought here is not consonant with the best interests of the people of this State, is impracticable and inordinately costly and is disruptive of state representative government. In its argument that the present maps are constitutionally valid, defendant attempts to distinguish the *Kirkpatrick* and *Wells* cases on the basis that in both of those cases the legislatures of the states involved enacted the Congressional redistricting plans in question only after a lengthy period of reluctance and political skirmishing. Defendant also argues that in any event *Kirkpatrick* and *Wells* were wrongly decided and that subsequent personnel changes on the Supreme Court may produce a different result in future cases. We have carefully considered the two 1965 maps and the deviations found in each, and we find that measured against the most recent tests expressed in *Kirkpatrick* and *Wells* these maps, though deemed constitutional when promulgated, can no longer pass constitutional muster. In the *Kirkpatrick* case, deviations of only 3.13 per-cent above and 2.83 per-cent below the average were held invalid. In *Wells* the deviations ranged from 6.6 per-cent above to 6.8 per-cent below the average.

Both *Kirkpatrick* and *Wells* demand mathematical exactness in drawing Congressional districts. The requirement of equal voting power in selecting members of the United States House of Representatives is drawn from language in Article I, Sec. 2. Wesbury v. Sanders 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The requirement applicable to state legislatures arises from the equal protection clause of the 14th amendment. Reynolds v. Sims, 377 U.S. 533, 568, 84 S.Ct. 1362 (1964). The Supreme Court has not in express terms withdrawn its suggestion at p. 578, 84 S.Ct. at p. 1390 of *Reynolds* that, "Somewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting." The Court has, however, said that the standard in both situations is "as nearly as practicable," and has defined the standard, in *Kirkpatrick* (394 U.S. p. 531, 89 S.Ct. p. 1229), as permitting, "only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown."

■ We conclude that the standard applies here and has not been met. Accordingly, considering the deviations from equality according to the 1960 census figures, both the court drawn plan for the election of members to the Illinois Senate and the Commission drawn plan for the election of members to the Illinois House of Representatives are each and both unconstitutional. We now consider the appropriate relief.

One alternative to be considered is judicial creation of districts which would have equal population using 1960 census figures. It seems certainly too close to the 1970 elections to follow the procedure of allowing a reasonable period of time for legislative action, after which the court would act if the legislature defaulted. Because the Illinois elective process will begin December 8, 1969, there is no time even for judicial districting unless the court suspends the operation of the elective process according to the time table chosen by Illinois for a period of several months. Assuming these steps to be possible, it is sound judicial policy to avoid them unless the merit of the result which can be achieved clearly outweighs the difficulties and policy considerations which make them undesirable.

Here we turn to the fact that since 1960 there have been substantial changes in the distribution of population through-

out Illinois. (See "Population Estimates and Projections", U.S. Department of Commerce, Series p-25, No. 427, 7–31–69). Of course if exact equality per 1960 figures had been achieved early in the decade, such districting would still be in force and be constitutionally valid for the 1970 election notwithstanding these shifts in population. Reynolds v. Sims, 377 U.S. p. 583, 84 S.Ct. 1362. But to put such a districting in force after the shifts have been known to occur, for only the last election in the decade, and in order to achieve, at best, only minor corrections seems to have little weight in its favor.

This court recently considered a challenge by one of the same plaintiffs to the present apportionment of wards in the City of Chicago. Skolnick v. Mayor, 66 C 2134, 415 F.2d 1291 (1969). In that case the terms were for four years, the last election of the decade had already occurred, and the 1970 census figures would be available in time for the next election. One question presented was whether a new ward map should be created, with equal districts according to 1960 census figures, and a new election ordered for the balance of the current term. In that case Judge Campbell found that "the 1960 census figures no longer portray the present population scheme." (Quoted in Court of Appeals opinion, 415 F.2d at 1295.) In affirming Judge Campbell's decision, the Court of Appeals discussed the complete unreliability of the 1960 figures for the purpose of redistricting the city in 1968 as well as the complete impossibility of obtaining more current or reliable figures.

"It seems clearly established the only reliable method to determine the City's present population would be by a special census, that is by a physical "head count." It also is established that no reliable studies are available at this time for use in achieving acceptable population figures for any ward or other segment of the city.

It is shown that expense of undertaking a complete special census would approximate the sum of $800,000. Further, there can be no assurance that the Census Bureau could or would undertake such a project at this late date in view of the close proximity of the next regular census to be taken as of April 1, 1970. It is shown that eight months time would be required to organize, conduct and finally complete such a project.

Further, a special census could be justified only for the purpose of holding a special aldermanic election prior to the next scheduled election on February 23, 1971. It is shown that such an election would cost an estimated $800,000, and more if a run-off is required in any ward.

It is apparent that the time required for a reapportionment on the basis of a special census and the additional time needed to prepare for an election, with all the procedures there involved, would consume a period of approximately six months.

Taking into consideration the relatively brief time such a newly elected City Council could serve prior to the February, 1971 election, together with expense and difficulties inherent in taking a special census and conducting a special election, under the facts of the instant case, we are compelled to the conclusion that such a course of action cannot be reasonably justified.

*It is certain that a reapportionment based on the 1960 census figures could not be used for present reapportionment of the wards.* All would agree they are not reliable because of obvious and substantial population changes and shifts since 1960. No relevant supplemental data has been shown to be available. This is but another way of saying again that a physical "head count" has been shown to be the only reliable method which can be used." (Emphasis Supplied) (415 F.2d at 1298–1299)

Defendant Illinois State Electoral Board, suggests that the most practicable remedy is for this court to retain juris-

diction and, after the 1970 census figures are available, to measure the present maps as against those figures and determine at that time whether the maps meet constitutional standards. This proposal suggests the possibility that the many population shifts may have cured the "minor deviations" present in the 1965 maps since their adoption. With this relief in mind, defendant suggests that members of the lower house be elected in 1970 for a two year term and members of the upper chamber be elected for a four year term with the proviso, however, that if the present maps are subsequently found unconstitutional the Senatorial terms may be reduced to two years. So limiting the terms of Senators would not be unprecedented. In Germano v. Kerner, *supra,* upon finding that the districts were unconstitutional, this court undertook the redistricting which resulted in the court drawn map, and also ordered election of all Senators, whether their terms were completed or not, under the new judicially formulated map.

Defendant further urges that whatever relief the court may decree it not impose upon the State the ordeal of an election-at-large. We take judicial notice of the unfortunate experience in Illinois in 1964, when all 177 members of the House of Representatives were elected at-large. We have considered the present possibility of another at-large election and reject it as a completely impracticable and inequitable remedy, particularly here where such relief would include an election at-large of 177 members of the House of Representatives and 58 members of the Senate. Furthermore, such action would necessarily influence a pending case in this court, challenging the constitutionality of Illinois' Congressional districts and thus possibly adding 24 Congressmen to a completely unmanageable ballot. (Skolnick v. Illinois State Electoral Board, 69 C 755 307 F.Supp. 698). In the City ward map case, it was observed relating to at-large elections:

"Plaintiff Skolnick has filed a one page statement in which he urges that an at-large election be held in November 1968. Upon reflection and in light of the reasons advanced by other parties opposing an at-large election (See supplemental memorandum for Chicago Bar Association, *Amicus Curiae,* filed August 9, 1968; and suggestions of defendant City Council, filed August 29, 1968.) I have decided against such a solution.

I should point out that the briefs of the *Amicus Curiae* and the defendant City Council as well as the cases cited therein, stress that the at-large election is a harsh remedy which should be reserved for the most flagrant cases of malapportionment." (415 F. 2d at 1295, note 4)

■ Although an election at large of a legislative body achieves exact equality of voting power for every voter, it usually tends to. reduce the effectiveness of his voice. It is an undesirable remedy for the problem of disproportionate districts, and the larger the electorate and the larger the number of representatives ordinarily elected by districts, the more undesirable a remedy it ordinarily tends to be.

Plaintiffs Skolnick and Sherman have proposed that somehow a computer from somewhere might provide the court with acceptable and current census figures. Plaintiff Skolnick made the same proposal to the Court of Appeals on oral argument in the City ward map case. This vague proposal was rejected by that Court.

"Plaintiff on oral argument proposes that the 1960 census figures could be adequately updated and available for present use with a computer. However, it is not made clear to us how such an operation could achieve an acceptable result. Such a proposal would seem to be founded on surmise and conjecture." (415 F.2d at 1299)

The *Amicus Curiae,* Chicago Bar Association, in its proposal for appropriate relief, first noted that the experience in the City ward map case clearly establishes the impossibility and imprac-

ticability of a special census and of drawing any new maps based on 1960 census figures. The *Amicus Curiae* proposed, however, that any term of office under a map containing now unconstitutional variances should be limited to the most minimal tenure, in this instance two years. In other words the *Amicus* proposes that members of both the House and Senate should be elected in 1970 for a two year term, notwithstanding the provisions of the Illinois Constitution and the language of the Illinois Supreme Court in People ex rel. Engle v. Kerner, 33 Ill.2d 11, 14, 220 N.E.2d 165. The *Amicus* further suggests that this court retain jurisdiction and provide that following the elections in 1970 and as soon as the 1970 census figures are available, the legislature adopt constitutional plans. Finally, the *Amicus* suggests that the court order the legislature to remain in session until such maps are presented to the court.

■ We believe the proposals of the *Amicus Curiae* generally make good sense and are the most practicable and equitable under the circumstances. As we stated above, we deem it impracticable to draw new maps for the 1970 election, creating districts of equal population according to 1960 figures or to order any special census, or an at-large election. Thus we, a Court of Equity, are presented with the only equitable alternative, to wit, election in 1970 of both Houses under the present (1965) maps. With respect to those maps, we find that under the circumstances they are, "the best that can be had within the framework of the Constitutional provision applicable until 1970, * * *." Jackman v. Bodine, 53 N.J. 585, 252 A.2d 209, 211 (1969); cert. denied, 396 U.S. 822, 90 S.Ct. 63, 24 L.Ed.2d 73, Oct. 13, 1969.

As stated in substance by the *Amicus*, however, any term of office authorized under a plan which does not meet present constitutional standards should be as limited as possible—in this case one term of two years, for members of both houses. We do not find this relief inconsistent with the holding of the Illinois Supreme Court in People ex rel. Engle. That opinion, as the related opinion of this court in *Germano*, recognized that the plan adopted there was temporary. Nothing in those opinions intended to assure tenure to future Senators elected under an unconstitutional apportionment plan. On the contrary, support for the limiting of terms is found in those cases, since terms of one-half of the then sitting Senators were limited to two years with the adoption of that map. The Supreme Court has repeatedly indicated its approval of such judicial action. Hughes v. WMCA, Inc., 379 U.S. 694, 85 S.Ct. 713, 13 L.Ed. 2d 698 (1965); Davis v. Mann, 238 F.Supp. 458, aff'd 379 U.S. 694, 85 S.Ct. 713, 13 L.Ed.2d 698; Parsons v. Buckley, 379 U.S. 359, 85 S.Ct. 503, 13 L.Ed.2d 352 (1965).

It also appears certain that the State Constitutional Convention which convenes December 8, 1969, just a few days from now, will propose substantial changes in the legislative branch of Illinois State government.*

Plaintiffs' attack on the cumulative voting provisions of the Illinois Constitution appears to be based on their conclusion that cumulative voting for Representatives is complex and has produced discriminatory results. The system does afford each voter a choice of whether to cumulate his three votes in addition to the usual choices among parties or candidates.

---

\* For an example of the potential changes we refer to a most recent proposal of our Chicago Bar Association's Committee on Constitutional Revision, which has been in the forefront thus far in offering proposals for improvement in the State Constitution to be considered by the Convention. The Committee proposes that the number of Senate districts be reduced from 58 to 50. It further proposes that House membership be reduced from 177 to 100, but that the number of districts be increased from 59 to 100 with each of the 50 Senate districts being divided into two Representative districts. Cumulative voting is also eliminated. All of these changes would go into effect in 1972.

Without passing on the complexities or lack thereof of the system, which exists only in Illinois, we note that its validity has been consistently upheld. People ex rel. Daniels v. Carpentier, 30 Ill.2d 590, 198 N.E.2d 514 (1964); People ex rel. Espey v. Deneen, 247 Ill. 289, 93 N.E. 437 (1910). And while we express no opinion as to the wisdom or desirability of the cumulative voting device —which some contend insures rather than discriminates against minority representation—(See Dixon, Democratic Representation, Oxford University Press, 1968, pp. 523–525 and authorities cited therein), we find no indication that cumulative voting in any way violates the Equal Protection provisions of the United States Constitution.

Accordingly and for the reasons expressed herein, IT IS ORDERED AND DECREED as follows:

I.   The present court drawn and commission drawn maps for election of members to the Illinois Senate and House of Representatives, though deemed constitutionally valid when adopted and though the deviations from the required mathematical exactness are slight, the said maps are each and both presently unconstitutional.

II.  All members shall therefore be elected to the Illinois House of Representatives under the present map only for one more term of two years at the general election scheduled for November, 1970.

III. All members shall therefore be elected to the Illinois Senate under the present judicially formulated map, only for one term of two years at the general election scheduled for November, 1970.

IV.  This court assumes that the General Assembly of Illinois will, during its legislative session in the first half of 1971, enact a complete and constitutionally valid plan of reapportionment for both houses of the Illinois General Assembly (or, if the Illinois constitutional provision for a legislative body be changed, of such legislative body). Defendant is hereby ordered to present to this court on or before July 1, 1971 such duly enacted plan of reapportionment. Upon failure so to do this court shall undertake appropriate relief.

V.   This court retains jurisdiction of this cause to fully carry into effect the foregoing.